Are you going to separate the argument or are you going to do it all yourself? We're going to separate the argument. My name is Ben Coleman. I represent Fidel Villarreal, which is defendant appellant number two. At council table is David Zugman. He represents Raul Villarreal. Our tentative plan is to divide the argument. I'll take 13 minutes and Mr. Zugman will take 7 minutes. And I'm going to try to focus on the public trial and the attack on the bribery count of conviction. And Mr. Zugman will address sentencing. And obviously we'll adjust as the court sees fit, but that was our tentative plan. All right. And I'll watch the clock and try to save some time if I'm able to. With respect to the public trial claim, I'd like to start off with the standard of review. The government has contended that we have either forfeited or even waived the claim. It's our position that both Rule 51 and this court's fairly recent decision in Rivera addressed that issue. In this case, the defense counsel, the trial counsel, asked that the brother be allowed to remain in the courtroom and perhaps at most be given a warning outside the presence of the jury. And that's all that's required under Rule 51, and Rivera, we think, makes that fairly clear. So we think that the standard of review is de novo. And with that, I'll get to the merits of the issue. This public trial claim is one of the few areas of the law that's considered a structural error. The Supreme Court has indicated that it should, if someone's going to be excluded from the courtroom, it should be done with special care. It's our position that in this case that special care was not given. There was no mention of the Wall or Presley factors at all. In this case, if you look at the way the events unfolded, the initial discussion was there was somebody from the U.S. Attorney's Office who was maybe making some faces or doing things, and defense counsel notified the court and said, we'll be able to. It wasn't the defense counsel that was making the faces. The claim by the prosecutors was that Gonzalo was making the faces. That's correct. Well, I was just going back to the beginning. What had happened at the beginning of the trial was that there was a, I guess, a prosecutor or someone from the U.S. Attorney's Office was in the audience and apparently was making some faces towards the defendant and defense counsel. And what the defense counsel said is, you know, we saw this going on. We think we can meet and confer and address this issue. And then the judge said, listen, I want everyone in the courtroom to maintain a poker face. And the comments were really more directed towards the government side of the house is what he called it. But he said, I want everyone to maintain a poker face. There was no indication of any problems at all to the defense until all of a sudden in the middle of the trial, the prosecutor gets up at a sidebar and says, the brother of the appellant has been staring down prosecution witnesses, has been getting in their way as they're leaving the courtroom or leaving the courthouse, and has even made some threatening gestures like a throat-slitting gesture or something like that. There was no meet and confer. Nobody raised this issue with defense counsel ahead of time so that they could say to the brother, listen, they think that you're engaging in inappropriate behavior. You need to watch yourself. Nothing happened at all. It just all came on all of a sudden. And then the judge essentially just adopts the representations of the government. Well, the judge also said that the marshals had reported it to him early on, and he had decided not to do anything unless the government raised it. That's correct. So he had another source of information. Correct, although we don't know exactly what the marshal's report was. We just know that there was a report that there may be a problem with this particular spectator. But we don't have any specific indication. And there was no, when the judge made the decision to exclude the brother, there was no discussion of really whether he should just be excluded just for the cooperator's testimony, because that was really the only concern was that there were these handful of witnesses who. But couldn't, so let's say if your argument is he should have been allowed back in for closing argument, couldn't the other witnesses have been allowed in for closing argument? And so those same witnesses that the judge, given these reports, was worried that he was threatening, could have been threatened during closing argument just as much as they could have been threatened on the stand? Well, even assuming these other witnesses wanted to attend the closing argument, and there's no indication that they did, at least at that point their testimony wouldn't be affected. I mean, the testimony would be over. I think the concern was that these witnesses were going to be intimidated, and therefore their testimony maybe would change or they wouldn't want to testify. At that point, the testimony is concluded. It's over. The evidence is in. Well, I mean, doesn't the judge have some obligation, though, to just preserve the integrity of the entire system, and if we have witnesses who, as soon as they're done testifying, get threatened, I mean, that's not great for criminal trials either. It seems like there's an interest in preserving decorum and preserving safety in a courtroom that continues after the witnesses testify. Well, I do think that that's true, and certainly, but with respect to the Waller Standard, other reasonable alternatives need to be considered. This is sort of a last resort is total exclusion from the courtroom. If, for example, these other witnesses wanted to attend the closing arguments and he was attending the closing arguments, it certainly seems that there would be ways that either with the positioning of agents or marshals and a warning to the brothers separating them on different sides of the courtroom so that there could be no interaction, that those are the types of things that. . . So why didn't the defense counsel make this argument? I mean, so I hear you that they objected a little bit at the time, and so I'm willing to give you that you didn't waive this totally, but once you get to the idea that they should have considered a specific thing, like admission back in for closing argument, why should that be something that has to be, without the defense counsel arguing it, why does the judge have to go through every possible thing that hypothetically might be considered if no one's arguing that that would be a good solution? Well, I think the standard does put an onus on the court to sort of correspond to consider these issues, and that's what the Waller standard sets forth. I'm not sure that the Supreme Court said that the defense counsel has to make every suggestion. It puts an onus on the court because this is the right to a public trial. It's not just the defendants. It's the public in general, and the court has not . . . Right, but the one option could have been that he could have excluded everyone from the courtroom, and instead he only excluded the person who was causing the problems. And, you know, so that was a narrowing. He considered whether he could just admonish everyone. He said, I've already tried that. That's not working. I mean, it's not like he didn't consider anything and didn't narrow it in any way. Well, he did say that he had previously given the warning. I don't know that he necessarily considered anything else, but the warning was the only thing. You know, again, and that's why I kind of went back to the way this all unfolded. You said, well, why didn't the defense counsel raise this as a potential alternative? I mean, the way it should have been done, if there were such serious problems, you would think that someone would have mentioned something to the parties . . . to the defense earlier. But nothing was done. This was sprung at the last second. The defense said, look, we haven't seen any of that. It doesn't mean . . . Counsel, you . . . This is a very . . . I'm looking again at what the judge said, and he was pretty specific, and he confronted the brother, had him standing in front of him, and he read a pretty strong list of things that he was doing, and he said, and I admonished everybody in the courtroom that there would be no nonverbal contact to show support or nonsupport of any witness, or they would be excluded, or the court would take some other action in that regard. You were here. I remember you sitting in the back by the door at that particular time. My thinking, sir, is to exclude you from this courtroom and this floor in light of that conduct. Do you have anything you'd like to say in that regard? And he said, no. And he says, no, sir. Now, if defense counsel thought it was important, defense counsel could have said, well, Your Honor, we think that's too harsh, or certainly, well, the witnesses are on the stand. It seems the court's justified. This is very serious. It isn't just stares. It's confronting these witnesses in the hallway. That's not been rebutted. And if the trial proceeds and counsel wanted the excluded person brought back and allowed back in during argument, they could have broached it at that point and said, okay, there are no witnesses on the stand now. We think Mr. Villareal should be able to come back in. None of that. Well, they did previously say that we think he should be allowed to remain. Well, they did previously, but they didn't ask this, particularly with closing argument, when there weren't witnesses on the stand. But this is kind of serious conduct. It's very serious conduct. And so to take the generalizations about public trial, the court also has the ability to control its courtroom. And if people sit in the back of our courtroom, for example, and use and talk on their cell phones, we can exclude them. And we'll exclude them. I've had plenty of judges in my days running their courtroom, and I'm sure you have too. So to upend an entire trial because he excluded a spectator, albeit a family member, I understand that. And then there was no effort on the part of defense counsel. You say this is de novo review or plain error review? Yes, Your Honor, we believe it's de novo. And the reason why is I understand there was no follow-up after the judge excluded him. It's our position that under the Rivera case that the defense counsel's initial request for him to remain is all that was required to preserve the issue, and that's why it's de novo. And I do want to go to the bribery count of conviction. Yeah. So I'll just move to that now. No, it's an important issue. I just want your reaction. I understand. And courts are obviously allowed to maintain the decorum in their courtroom. There are obviously different standards that apply on appeal than in a jury trial. I understand that. I was saying just here, but I've been in trial courts too. Of course. With respect to the bribery count of conviction, we believe that there's a case that's really very closely on point called Gaskins. And Gaskins holds that if you give a supplemental, that it's improper to give a supplemental aiding and abetting instruction after deliberations have begun and closing arguments are concluded without at least allowing further argument so that defense counsel can address this new theory of liability. Was there a request for a further argument? There was not, but there was an objection to the instruction. And, again, the district court, when the defendants objected, said your objections are preserved. And this district court specifically informed the defense counsel of that. And so we believe that they did it. Objections to the instruction, but not necessarily the idea that you needed to have another closing argument, right? Correct. It's our position that once the defendants objected and said, listen, we had no notice, this is a whole new theory that's being articulated after arguments have been concluded, if the government wanted that theory, the onus was on them to say, look, we want this theory, we think you should do this, but you should know that if we do do this, supplemental argument is required. And, again, looking at the way this issue unfolded, the parties originally went into court and they had an agreed-upon response to the jury's note. And then the judge suggested aiding and abetting liability, a new instruction, and then the government backed out of the agreed-upon response and said, okay, we'll go, Your Honor, with your suggestion. I mean, in those circumstances when the government led the defense to believe that they were going to address the issue one way, and then they go off and do a different thing and the defense actually objects, we think that the issue is preserved. If we say we think this is an error, I haven't read your papers to really offer any explanation for why there's prejudice here. Now, I know the jury sent the note, but, like, what would you have said about aiding and abetting? How did they have any argument that there wasn't aiding and abetting here? I haven't seen anything like that that what you would have said in your closing argument if you'd had one that somehow would have changed the outcome. I just don't see that in your papers or anywhere. Well, I'll address that directly and then I have a second response to that as well. The first is that, particularly with respect to my client, the evidence that he actually received any money was very weak. The only evidence came from the cooperating witnesses who said that But under aiding and abetting he doesn't need to receive it himself. That's the point, right? So what could he have said? What he could have said in his defense was these people were friends. The smugglers were friends with the border patrol agents. And he could have been this brother who, let's say, didn't receive any money, thought he was helping out his friends but not being paid or anybody was, the border patrol agents were being paid or bribed to do this. That's certainly what my client could have said. But we think the prejudice inquiry in this context based on Gaskins, and Gaskins was an overwhelming case. The defendant in that case had a methamphetamine lab in his house. The smell of ether was so strong that when the agents came to execute the warrant, they had to wear gas masks. So what could the defendant have said in that situation? But what this court said is when you look at the prejudice, it's whether the defense counsel's closing argument was prejudice because he was not afforded at least the opportunity to respond to the theory of liability. And that's what occurred here. There was no opportunity to respond to that theory. And that's where we think that that's what the prejudice analysis should be. But we also think that there would have been something to say even. Can you explain again what you think you could have said? Because I don't understand it yet. The people who were the smugglers were friends. They had a previous friendship relationship before they went into a smuggling relationship. And so what the defense theory could have been was that, especially for my client who there was really very little evidence that he received money, other than from the cooperators, which had a somewhat strange story as to where that money went. It was eaten by rats or something like that. He could have said, look, his intent was that he was just helping his friends get alien smugglers in. He wasn't intending to be bribed or for his brother to be bribed. He was just, his intent was simply to help these people smuggle aliens. It wasn't for money. It wasn't as part of a quid pro quo bribe. It was just to help out some friends. But there were so many people being smuggled, right? Like, how plausible is that? I mean, why would anyone do that? Well, I get, I mean, this jury had a question. I mean, they, they, I mean. Right, but their question was. Was whether both had to be held or they could decide one and not the other. Right. So they at least had a question about the culpability of one of them as to bribery. I mean, they, and I think it may be, if you look at just some hypothetical jury, you could look at the evidence and say, well, we think a different jury would have reached, clearly reached the same result. But it's what did, what did the effect have on this particular jury? And this particular jury asked this specific question, showing that they had concerns about this count as to at least one of the brothers. Your time's almost up, and your, I mean, your time is up. Thank you, Your Honor. Good morning, Your Honors. David Zilkman on behalf of Raul Villarreal. Your Honors, obviously we raised numerous sentencing issues, but the one I would like to focus on is the 5G issue. Because this has the rare quality of being a clear difference of opinion as to what the law requires. It is the position of the Villarreal's that 5G 1.1, as well as Amendment 767, make very clear that the procedure for a multiple count, multiple count grouping, when you have one count, the bribery count, with its 15-year statutory maximum, the district court has to take account of that. That is good policy for a couple of reasons. The lesson of the last decade and a half in Apprendi has been that statutory maximums matter, statutory maxima. Under the government's interpretation, it is completely irrelevant that the bribery count, the only count in that group, has a 15-year cap. It simply gets no play under the government's analysis. But it is very clear under 5G 1.2 that the district court should have accounted for that, and that the starting level or the starting sentence for that group should have been 180 months, not the life sentences that the district court calculated. That error affected the entire sentencing. But there was a second grouping error. The second grouping error is that when we do grouping, we do not consider, I'm sorry, when we determine how to implement the total punishment, we do not consider departures. We consider the heartland. That is Chapter 2 and Chapter 3 adjustments. The district court clearly considered departures, 5K, things that take the case out of the ordinary. But that is not the process that you're supposed to use when doing grouping. How does that prejudice you? Well, if we start out with 180 months as the range on the bribery group, then it's not life, which was the guideline calculation calculated by the court, 46 for Raul Villarreal and 43 for Fidel Villarreal. So it would massively change the beginning point for the analysis. The second is- But do the departures, it might change the beginning point, but do the departures come next? Is your argument that the order was wrong or that you just can't consider the departures at all? Well, it's a procedural error that when you're determining the total punishment, it's not that you can never consider the departures, just that 5G mandates a clear process. And in that clear process, you go through Chapter 2 and Chapter 3. But I think we're under plain error, right? There was no objection to this below? This precise objection was not articulated as it was articulated in the briefs. However, the defense counsel repeatedly, at length, argued that the statutory maximum was the relevant determination. But that's different than this departure and the order it should have happened argument. So I didn't see any objection to the order. So if we assume we're under plain error, I think you have to show us that following the right order would have led to some different range. And I haven't seen that in your briefer. I still don't understand if you can even get there. Well, when you're making the determination about whether to run something concurrent or consecutive, it matters where you start. And under the district court's analysis, it went to the end of the story and decided, well, here are the sentences that the guidelines calculate with departures, instead of looking at whether to run it concurrent or consecutive in light of the 15-year cap for bribery. This is an error that the government encouraged. The government urged that the district court group the case in this manner. It wasn't, I mean, there's no rule that says that this is how it must be grouped, but this is how they encouraged it. And even if it's plain error, what I'm talking about is a very clear conflict of law, right? We are saying that you have to account for the 15-year. That's the first argument, right, not the second. So you have two things. You have what I think. Oh, you mean the prejudice aspect. Yeah. So I'm worried about the prejudice. It seems like you're making two arguments. One is, I think, what we could call a Brinton error or alleged error. The other thing is this ordering of which way you do the departure. So just on the second one, the departures, I don't hear yet an explanation for how doing it in the correct order would have given some different sentence. I didn't see that in your brief, if there is an argument. There is a citation in our brief to United States v. Munoz, Camarena, which 611 F. 3rd, 1028. And in that case, it says if the district court were to use the correct process, it might arrive at a different sentence. And we must admit here that it's a massive difference, the difference between. But where do you argue that it's a massive difference and show us how doing the correct order would have. In our opening brief, the point we were attempting to get across was that the 15-year cap, like when you do the bribery count and you do the calculations, the last point is use the 15-year cap. But that's the Brinton error, isn't it? Okay. You're talking about for when do the departures come in for total punishment. That is a specific. I suppose we don't know. Since it is plain error under your honors analysis, the district court didn't give us any indication how it might have. And neither have you. You haven't said if they'd done it the right way, this is how it would have been constrained. It would have been a much lower guideline range, right? It would have been considered without departures. And to the extent that the district court is supposed to correctly calculate the guideline range, it is assumed that if the guideline range is lower, then the sentence generally is lower. But if the departures can come after and your issue is really just the order, you could end up in the same place. We could have never had the grouping. They could have not charged bribery. The district court could have convicted, looked at the alien smuggling guidelines, and then departed up. It's not like there's no other path to the top of the mountain or the bottom of the valley is. On the Brinton error. Yes, Your Honor. Are you relying on Brinton for that argument, or do you have some argument that exists if we don't read Brinton as saying this is an error, say? Is there some other argument other than relying on Brinton? Because it's a 1998 case? Well, no. I mean, let's put it aside for a moment. 767. The Sentencing Commission adopted this specific analysis, that we do multiple count grouping the same as we do single count. That's what the Sentencing Commission resolved in 767. I note that I am over. Thank you very much, Mr. Zubman. Thanks, Your Honor. Good morning. May it please the Court, Timothy Slaw for the United States. First of all, regarding the closure issue, this Court recognizes that the Sixth Amendment right to a public trial is not absolute and unlimited. Here, Judge Houston got it right, did the proper balancing. It was a proper closure. How did he do the balancing? Well, he recognized in looking at the findings in context, you can see that the judge Findings? What findings did he make? In the context of the concern that the government had related to the witness intimidation. Yeah, but you're saying there's a difference between findings and what he stated. And I credit what he stated. He didn't make specific findings as to alternatives, for example. You're not suggesting that? As far as alternatives, Your Honor, the defense counsel first said, as Your Honor recognized, We think that admonishment would be appropriate. And the court said, no, I've already done that. And the court did that in the beginning right after opening statement. The admonishment wasn't to the, it was to, the admonishment was as to reactions which people would have as to testimony. It was keep a poker face when you hear something, don't nod or agree and thereby influence the jury. What Gonzalo was doing was not reacting to any testimony. What he was accused of doing was actively intimidating witnesses. So how does the earlier admonishment affect Gonzalo's actions? Your Honor, the poker face admonishment, the judge admonished all parties in the courtroom not to have any nonverbal communication whatsoever. And what Gerardo Villarreal was doing was making nonverbal communications with threats, throat slashing gestures, staring people down and approaching them in the hallways. Let me try again. What the judge was saying was, I don't want people reacting to testimony and arguments. Keep a poker face. Gonzalo wasn't reacting to any arguments or actions by anybody else. He was the active party. He could very well have thought, that admonishment doesn't affect me because I'm not reacting to anything. Your Honor, the court did advise him and reminded him that he was admonished and he didn't dispute that. Also, defense counsel was alerted to the fact that the court said, and this is at excerpts on page 50, I gave an admonishment to everyone in the courtroom after your concern about the agent's conduct. He was sitting right there. When I gave it, I gave an admonition to everyone generally. And defense counsel for Raul Villarreal said, yes, your Honor. And Fidel Villarreal's counsel said, the only thing I would request is that it not be done, that is, remove him in a way that becomes obvious to the jury. So the court did clarify, with defense counsel and with Gerardo Villarreal, that the admonishment did apply to him related to the nonverbal communication. And additionally, in considering the alternatives, your Honor had a question about the alternatives. The admonishment was given after opening statement. The judge later, on the first day of trial, heard a concern from the marshals about threatening looks. And the court at that time decided to take no action, let it proceed, and wanted to hear from the government if any additional things were necessary. And then later on, when it became too much, the government alerted the court to this at sidebar. And the court at that point decided to call a hearing to allow Gerardo Villarreal the opportunity to either dispute or clarify what he was doing. At that point, he did not dispute the misconduct, and the court took the appropriate action. Given the serious nature of the nonverbal communication, the throat-slashing gestures, the repeated approaching of witnesses, the court took the appropriate action in removing him for the rest of the trial. And I believe that in considering the seriousness and the serial nature of this, that that was the appropriate action. You do agree that eliminating one person makes it not a public trial and therefore could be a structural error? Your Honor, I believe in this case, the rest of the family was there at the trial. The Villarreal's both recognized that they had strong family support throughout the whole trial. And I think the Supreme Court... Is that the purpose of a public trial requirement, that the family be supportive? Or is it that the public community understand what's going on in court? Well, I believe the four core values would be to ensure a fair trial for both parties, to encourage witnesses to come forward, which is what Gerardo Villarreal was inhibiting, also to remind the judge and the prosecutor of the importance of their responsibilities to both the accused and the process, and finally to discourage perjury. In this case, the Villarreal's were given a fair public trial. The brother was kicked out for misconduct that was appropriate. And if the court had any concerns about the findings or what the court didn't do or didn't consider, that it should be a limited remand for the court to consider. To reverse this altogether would be an absolute windfall, and that would not be appropriate under the circumstances here. How could we have a limited remand? A limited remand for the purpose if, for instance, this court had concerns about the findings that they weren't adequate for this court to address, or that the court had concerns on whether or not the judge considered alternatives. There could be a limited remand to see what the court considered and the findings. But we'd have to reverse the conviction and vacate the conviction, right? No, not necessarily. It can be appropriate to the... In Waller they talked about having a limited remand for purposes of evaluating whether or not a Sixth Amendment violation occurred. Moving on to the bribery, Your Honor. The supplemental instruction the government concedes is error. It was an error to give the aiding and abetting instruction. The government did not recommend aiding and abetting instruction originally when the court had the jury conference or jury instruction conference. This is clearly distinguishable from Gaskin's. First of all, there was no Rule 30 violation. The aiding and abetting instruction was not proposed by the government, and then the court brought it up on its own, so it's distinguishable on that basis. This is a brand-new series under constructive amendment of the indictment? That's correct. We recognize that it is a new theory. There was no detrimental reliance the way that what occurred in Gaskin's in that case. There was no request to reopen as occurred in Gaskin's. Gaskin's also involved a situation where there were two notes. The first note, the jury was concerned... I understand you to agree with me that it was a constructive amendment of the indictment? I'm sorry. Well, if there was no aiding and abetting charge laid in the indictment and this was a new theory popped on the defendant in the middle of trial while the jury was out, why isn't that a variance from the indictment? Well, Your Honor, aiding and abetting, as recognized in Gaskin's and other cases, is inherent in every charge. And the aiding and abetting is, though, when presented in jury instructions, can be a new theory if it wasn't in the original jury instructions. So... Well, you answered yes to Judge Baez's question whether it was a constructive amendment of the indictment. Maybe I'm... I apologize. I misunderstood. The aiding and abetting, to clarify, is inherent in every charge, as recognized in Gaskin's. And here, the supplemental instruction was a new theory. But in this case, there was absolutely no evidence and no argument whatsoever presented by the government related to any aiding and abetting. In fact, defense counsel, when they objected, they said, and this is on page 74 of the excerpts, that's not the case the government presented. Their case has been that each defendant individually received a bribe. There's nothing in this trial that they presented that one helped the other receive a bribe. There was no testimony whatsoever from anyone that one brother picked up bribes and then gave it to the other brother who did the smuggling or there was any coordination between the two with respect to the receipt of bribes. There was obvious coordination and collaboration in the alien smuggling arrangements. But with respect to the receipt of bribes, there was no coordination and the testimony was that they each individually picked up or received the bribes personally. So this is very interesting because you're hurting your case in my mind. Because the way I thought we could resolve this is to say this is plain error. They didn't object and they can't show that it made a difference because they don't have a theory that there was not aiding and abetting. But what you're saying now is there was no aiding and abetting. And if that's true, then I think they have a really good claim because the jury asked this question. Well, the question wasn't like Gaskin's. Gaskin's was a question about indirect liability. And is it enough that if someone just provided their house without allowing or providing a physical space or being aware that the product is being made, that was the jury question in Gaskin's. It was related to indirect liability. The question in this case related to an awkwardly drafted instruction with the and or language in there. And the jury had a question about conjunctive or disjunctive. Wasn't it about whether a particular person had to receive the bribe? Yes. But it didn't have to do with any comment on the strength of the evidence with respect to one brother or the other brother. Why would you ask that otherwise? You get a jury note saying, in effect, can we hold one without the other as far as accepting the bribes? And a new theory is given to the jury at that time, which is, yes, you can under aiding and abetting. It's not necessary for B to have accepted a crime, a bribe, if he aided in abetting, abetted A in accepting a crime. And then they come back with a conviction. It seems to me that you sort of admitted that this was a constructive amendment of the indictment to charge a new crime while the jury was still out. The defendants had no notice that you were going to prosecute on aiding and abetting. And all of a sudden, the jury comes back with a conviction after they've shown doubt as to conjunctive or disjunctive liability. Your Honor, there was no constructive amendment. Maybe I misspoke or misunderstood your question. There wasn't a constructive... It was a brand new theory. It was a new theory. But, Your Honor, there was absolutely no evidence whatsoever on that theory under an aiding and abetting theory. The only evidence was that they each received their own bribes as principles. And so the convictions were proper. How do we know? The jury must have had some doubt whether there was evidence that each received a bribe because they're asking the whole way without holding the other. There was absolutely no evidence. In looking at the testimony of Claudia Gonzalez and Hector Cabrera, as far as the payment of bribes, the payment of bribes were to whichever brother did the smuggling. There was no aiding and abetting. He could have disbelieved one of the brothers was taking a bribe, but under this instruction, so long as he was aiding and abetting the other brother, he would be liable. Yes, Your Honor, but there was no evidence whatsoever of any aiding and abetting between the two. There was no evidence in the record of this. There was no argument by the government of this theory of liability whatsoever. Doesn't that mean that there was prejudice here? No, there was no prejudice. Because the jury asked the question because they thought they didn't know whether both of them received bribes. And so they asked that question. So maybe your answer could have been, well, it's so obvious that they were aiding and abetting, that giving the instruction didn't need closing argument, didn't need anything else. But instead you're saying they got this instruction and they could have convicted on it without there being evidence to convict on it. So how can that be something we can affirm? The only evidence and the only argument was with respect to them receiving bribes individually. There was no argument. But if that's the case, how do we know that the jury didn't use this instruction improperly? The jurors are assumed to apply the jury instructions properly and follow the law and the instructions as given by the jury. But this instruction said they can convict on this basis. Without any evidence, according to you. But there was no evidence. And that's, Your Honor, I'm sorry. That is why it is truly, there was no prejudice. There was no evidence and there was no argument whatsoever. Because the judge tells a jury you can convict on aiding and abetting. I suppose the jury is to follow that instruction, right? Well, I think they would. And the clarification was related to the and or. If one has it, is the other one guilty as well? The jury in deliberating after a month-long trial would look at all the evidence presented to see what theories anyone is liable on. The judge can't give an instruction if there's no factual basis for that instruction. Otherwise, the jury is misled. So I don't understand how you can be saying that this instruction didn't matter because there was no evidence to support it. That just means there really was a problem here. It was a superfluous instruction that didn't impact the deliberations and did not seriously impact the fairness of the trial. There was no evidence of it and there was no argument of it. Every time you say there was no evidence of aiding and abetting, it sounds to me like you're confessing error. It gets worse for you every time you say it. The evidence was that they received bribes. I understand what you see as the evidence, but try to step aside from what you've just said and consider what you're saying and the effect it may be having on this tribunal. You're saying that there was no evidence of aiding and abetting. The trial judge gave an instruction on aiding and abetting after the jury had passed a note to say, do we have to hold both of them or can we hold them individually? They get this erroneous instruction given without any evidence of aiding and abetting and they come back and they hold both of them on bribery. That's not the worst defense case I've ever heard. Your Honor, as far as the prejudice and as far as whether or not this seriously impacted the fairness of the proceedings, there was no argument. And again, the testimony... Can we go back and why don't you read the instruction to us that was actually given? There were two parts to it, correct? That's correct. Both of which referred to aiding and abetting. That's correct. Okay, so why don't you take that instruction and try to clarify for us why you think the amended instruction was superfluous and that the jury would not have gone to aiding and abetting given the state of the record or whatever. Based on the second element, and this is on page 77 of the excerpts, the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured that person to commit each element of the crime of receiving bribes. That is, one brother aided and abetted the other brother with respect to the receipt of bribes. There was no evidence of that. What was the first part of the instruction? The crime of receiving bribes was committed by someone. And yes, that's correct under aiding and abetting. The first part of the instruction directed that it could not find them guilty. Is that right? Yes, Your Honor. Okay, so why does that make that superfluous? It's superfluous under the state of the record in this case that there was no coordination in aiding and abetting between the two brothers with respect to the receipt of bribes. And it's superfluous in that the evidence related to their personal receipt of bribes as principles under the standard bribery counts was very strong, with multiple witnesses talking about them receiving bribes  corroborating that with respect to them transporting aliens on duty as well as receiving bribes personally. Claudia Gonzalez talked about delivering bribes down to Raul Villareal down in Mexico, down to Fidel Villareal down in Mexico, in the United States with respect to some of the smuggling events involving Fidel Villareal. All of the evidence related to them receiving bribes personally and indirectly, not indirectly with respect to the... Did you object to the giving of Instruction 32C? No, we did not. But you knew that there wasn't any evidence of aiding and abetting. Why didn't you? Your Honor, the court had proposed it and it was not... The court proposed it after getting a note from the jury saying, if one has it, is the other guilty as well? Showing some doubt as to whether they had to find both guilty or if one did it, the other was guilty as well. They give this aiding and abetting instruction with no evidence of aiding and abetting and they come back with a conviction. That sounds to me like error. Your Honor, this was a plain... The error was not plain. This is not the same situation as Gaskin's. There wasn't a Rule 30... What's not plain about a judge coming up in the middle of the trial with aiding and abetting when he's not charged in the indictment and has not argued in trial and it turns the jury's verdict around from questioning to conviction. Based on the whole state of the record, Your Honor, the court or the jury had a lot of evidence, a lot of testimony related to the bribery. I think you're over your time and we would like to give counsel for the appellant a little short change. Mr. Ziegler, if you want to use us on sentencing. Mr. Koehler, if you want to use a couple of minutes. I'll be very brief. Just on the bribery conviction, obviously if the bribery conviction goes and all the sentencing issues kind of fall away, you don't need to address those because the sentencing package becomes unbundled and it would go back for resentencing without the bribery conviction. It would have to go back for retrial. Well, yeah, they could retry the bribery conviction or not. Or just resentencing on the other conviction. Or they could get to resentencing without the bribery guidelines being used. So that's the first thing. The only issue I want to say is I think even if plain error review applies, we win, but the defense objected to the aiding and abetting, to supplemental aiding and abetting instruction, and specifically at ER 77 the district court says the objections are preserved. Rid, I thought it was plain error as to whether you got further closing argument, but now we're beyond that. I think we have de novo review. Even if it was plain error, I still think the bribery count should go, but we think it's de novo. All right, thank you very much. All right, the case of the United States of America versus Raul Villarreal and Ophelia Villarreal are submitted and thank counsel for a very interesting argument.
judges: Fisher, Bea, Friedland